**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**WAUKESHA LIME & STONE CO., Inc., Respondent.**

No. 14730.

United States Court of Appeals Seventh Circuit.

April 5, 1965.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Solomon I. Hirsh, Atty., N. L. R. B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, N. L. R. B., for petitioner.

O. S. Hoebreckx, Milwaukee, Wis., for respondent.

Before SCHNACKENBERG, KILEY, and SWYGERT, Circuit Judges.

SWYGERT, Circuit Judge.

The National Labor Relations Board petitions for enforcement of its order issued January 15, 1964, against respondent Waukesha Lime & Stone Co., Inc. of Waukesha, Wisconsin. The Board, having found the company had violated sections 8(a) (1), 8(a) (2), and 8(a) (5) of the National Labor Relations Act, ordered it to cease and desist from interfering with its employees in the exercise of rights guaranteed in section 7 of the act. The order also required respondent to bargain with Local Union No. 695, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, in respect to a group of employees that had theretofore been represented by another union, to offer reinstatement to quarry workers who had gone on strike, and to reimburse them for any loss of wages they may have suffered by the company's refusal to reinstate them in accordance with the order. The Board's decision and order, as well as the trial examiner's intermediate report, are reported at 145 N.L.R.B. No. 973.

Respondent quarries and processes stone. Subject to seasonal changes, it employs between thirty and thirty-five hourly rated men. In June, 1962 respondent and six other quarries in the area began renegotiation of their 1959 multi-employer contract with the Teamsters union. The Teamsters represented all the production and maintenance employees in the various quarries except that operated by respondent. At respondent's quarry the Teamsters represented only the mechanics, welders, and inside truck drivers, a total of about ten men. The company's other employees

were represented by the Engineers union, covering three men, and the Laborers' union, representing the balance of the employees who worked in the lime and crusher plants and the quarry pits. A group of independent contractors, known as ITO's, transported the company's products by truck from respondent's premises to its customers. During the 1962 negotiations, the Teamsters demanded that the contract include terms for the ITO's. This provoked a dispute which resulted in an ITO picket line being established at respondent's quarry on June 29, 1962. The basic issue in the instant proceeding relates, however, not to this dispute, but to efforts by the Teamsters to represent and bargain separately for the employees who theretofore had been represented by the Laborers' union.

The General Counsel and respondent are in agreement with respect to the contested issues. Our reference to the facts shall be limited, therefore, to those deemed essential to deal with those issues.

The trial examiner found that the company violated sections 8(a) (5) and (1) of the act by failing to bargain with the Teamsters union after it started to represent a majority of the quarry workers in what the examiner determined to be an appropriate unit. Further, the examiner found that respondent had violated section 8(a) (1) of the act by interrogating these workers concerning their union sympathies and by threatening to discharge them for joining the Teamsters union. On review, the Board adopted these findings. The Board, however, overruled the examiner's determination that the company had not violated sections 8(a) (2) and (1) of the act. It concluded that the company was guilty of such violation by having offered to execute a contract with the Laborers' union when it knew that the Teamsters union, in fact, represented a majority of the employees classified as laborers.

The primary question before us is whether the Board properly determined that respondent's refusal to recognize the Teamsters as the bargaining representative of its laborers in an appropriate unit converted the laborers' strike into an unfair labor practice strike on and after August 20, 1962.

Although the Laborers' union had been recognized as the bargaining agent of the company's laborers for many years, its last contract with the company in behalf of these employees was negotiated in 1951. Many of the laborers had become dissatisfied with their union. Early in July, 1962, two of the employees began obtaining Teamster authorization cards from among their fellow employees. On July 13 the Teamsters notified respondent that it represented a majority of the quarry workers and requested that contract negotiations begin. At that time the Teamsters possessed authorization cards signed by nine of the seventeen laborers employed by the company. On July 19 respondent rejected the request and suggested that since the Laborers' union had not disclaimed representative status, the Teamsters petition the Board for a certification election. The next day, July 20, fourteen of respondent's laborers established a picket line at the quarry for the purpose of securing recognition of the Teamsters union as their bargaining agent.

On August 7 the Teamsters petitioned the Board for certification for "all quarry employees," excluding truck drivers and engineers. On August 20 respondent informed the Board that it considered a unit composed of all the quarry employees, that is, the laborers and truck drivers, to be an appropriate unit. The strike continued until November 10, 1962, when the strikers applied for reinstatement. The examiner found that the August 20 communication constituted a refusal by respondent "on and after that day to grant the Teamsters' clear and unambiguous request for the laborers unit" which violated sections 8(a) (5) and (1) of the act and converted the laborers' strike into an unfair labor practice strike.

Respondent contends that there was no refusal to bargain because a unit of

laborers alone was not appropriate, because respondent had no reason to assume that the Teamsters represented a majority of the laborers at the time recognition by that union was demanded, and finally because the Teamsters never requested negotiations for a separate laborers' unit.

Notwithstanding respondent's contention that the Teamsters' reference to the "quarry workers" in their July 13 letter was ambiguous, it is apparent from the record that the union sought to represent as a separate unit that group of employees which previously had been represented by the Laborers' union. If, however, the letter may have had doubtful meaning to respondent, the petition filed by the Teamsters with the Board on August 7 must surely have dispelled such doubt. The petition itself excluded employees not sought by the Teamsters. Furthermore, the petition represented that there were seventeen employees in the unit sought to be represented by the Teamsters, and approximately twelve of these were participating in the strike. The examiner found that the petition "clarified and removed any of the Respondent's doubts * * * and that the Respondent's refusal thereafter to recognize the Teamsters as the representative of that unit * * * was not because of the Respondent's belief that the Teamsters' request was for a different unit." We think the examiner was fully justified in so finding.

In addition to claiming that it was not aware of the nature of the group of employees which the Teamsters sought to represent, respondent contends that the group was not an appropriate unit and thus that it had no obligation to bargain with it. The company contests the appropriateness of the unit on two grounds: (1) that there should not be within one company two groups separately represented by a single union and (2) that the examiner erred in his inclusion and exclusion of employees from the unit sought to be represented by the Teamsters.

In urging its first point, respondent says that it is inappropriate to have the Teamsters continue to represent the already existing unit of truck drivers, welders, and mechanics at respondent's quarry and now to represent separately the group of employees formerly represented by the Laborers' union. We do not agree with this contention. This court has recognized that "[I]t is axiomatic that the Board has wide discretion in establishing the correct limits of a bargaining unit." NLRB v. Weyerhaeuser Co., 276 F.2d 865, 869 (7th Cir. 1960), cert. denied, 364 U.S. 879, 81 S.Ct. 168, 5 L.Ed.2d 102 (1960). Historically, respondent's laborers were represented in a separate unit. The fact that workers in other quarries in the area are represented in a single unit is of slight relevance. Moreover, the difference in the composition of the two groups employed by respondent and the work performed by them constituted sufficient grounds for separate representation by the Teamsters.

In arguing that the trial examiner erred in his findings as to which workers constituted the proper group sought to be represented by the Teamsters, respondent says that the examiner improperly excluded two workers, Kuester and LaFratta, who should have been included in the group and improperly included five other workers who should have been excluded. Despite the company's contention that Kuester performed work of a character similar to that performed by those in the unit in question, the examiner found that Kuester was a "welder" and thus a member of the original unit already represented by the Teamsters. Although the company argued that LaFratta was just another worker within the group, the examiner found that his responsibilities and powers of direction indicated that he was a "supervisor" within the meaning of the act and thus not a proper mem-

ber of the unit.[1] The evidence showed that LaFratta was "overseer" of respondent's lime plant with a minimum of nine men under his supervision. In directing these men and the operation of the lime plant, he exercised "discretion or independent judgment."

■ Respondent argues that the five workers included in the group, Meyers, Chapman, Koch, Mundigler, and Badeau, were only "temporary" employees and therefore should not have been included in the bargaining group. The trial examiner found, however, that even though these men were hired only temporarily, they were subject to recall. He found "no indication that the 'temporary' employees * * * would not have returned to work * * * after their layoffs * * * absent their voluntary choice not to do so." Having examined the record, we conclude that there was sufficient evidentiary basis for these findings by the examiner and that his decision regarding the inclusion and exclusion of workers from the unit was proper.

■ Having determined which workers comprised the appropriate unit, the trial examiner was then able to make findings as to whether a majority of that group had indicated preference for the Teamsters union at the time respondent refused to bargain with that union. The examiner found that by July 20, when the strike against respondent began, thirteen of the seventeen employees in the group had indicated their support of the Teamsters. In addition to having signed authorization cards for the Teamsters, these men picketed the company from the July 20 date. As noted earlier, any doubts respondent may have had as to whether these strikers constituted a majority of the appropriate group were dispelled by the August 7 clarification by the

Teamsters' clear and unambiguous request to represent the laborers' unit. Moreover, respondent's letter of August 20 to the Board shows that there was no longer any uncertainty about the exact nature of the Teamsters' demand. Accordingly, giving respondent the benefit of the doubt for its prior refusal, the examiner found that respondent's refusal to bargain occurred from and after that time. This refusal was a violation of sections 8(a) (5) and (1) of the act and converted the strike into an unfair labor practice strike. Having reviewed the record, we hold that there is substantial basis in fact for the Board's adoption of the examiner's findings on this issue.

■ We next consider the examiner's finding that respondent violated section 8(a) (1) of the act by interfering with, restraining, and coercing its employees with regard to their section 7 rights. Respondent concedes that it attempted to ascertain the employees' sentiments regarding the Teamster attempt to gain recognition. The company urges that these inquiries were not prohibited by the act. To substantiate this contention, respondent cites this court's decision in NLRB v. Larry Faul Oldsmobile Co., Inc., 316 F.2d 595 (7th Cir. 1963), wherein we held that attempts to ascertain union sentiment, unaccompanied by harassment, is permissible employer conduct. We do not dispute this principle. To urge it here, however, begs the question since the examiner made specific findings that there was active interference by the company with the employees' rights.

There was evidence that two of respondent's officials interrogated employees regarding their union sympathies and threatened them against supporting the Teamsters. There was testimony

1. Section 2(11) reads: "The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

that one worker was warned to "stay clear of it" (the union) and that another who supported the Teamsters was told "you are in trouble." Although the testimony was conflicting, there was evidence that the company had interrogated its employees, had exercised surveillance over them, had threatened their discharge if they supported the Teamsters, and had declared that it would not contract with that union. We have examined the record and determine that the evidence supporting these conclusions was substantial and warrants the findings.

We now come to the Board's finding that respondent violated sections 8 (a) (2) and (1) of the act by offering to contract with the Laborers' union which it knew had only a minority status with the employees sought to be represented. As we have noted earlier, these employees were members of the Laborers' union which had long been recognized by respondent as their bargaining agent. About July 10, 1962, company officials met with Michael McMahan, a conciliator for the Laborers' union, to negotiate a new agreement. McMahan informed them that the Laborers' no longer had the support of the workers. Rather, McMahan said, "The Teamsters had them all." At respondent's request, McMahan made a further check and then reported to the company that "I think they have all been had," referring to the workers' alignment with the Teamsters instead of with the Laborers'. Despite the information given by McMahan, respondent offered to contract with the Laborers', but the offer was refused. Respondent's excuse for making the offer under these circumstances is that it had a good faith doubt at that time as to whether the Teamsters had, in fact, gained the support admitted by McMahan. In light of the long history of dealing between respondent and the Laborers', we can understand that this was a possible reaction which respondent might have experienced. It is also possible, however, that

the company reacted in the manner urged by the Board and simply refused to recognize the switch in union sympathies. The problem is essentially one of factual determination. We hold that there was sufficient evidence to warrant the Board's resolution. Accordingly, the company's offer to contract with the Laborers' when it had been informed that it no longer represented a majority of the workers constituted unlawful assistance to the Laborers' union and thus violated sections 8(a) (2) and (1) of the act. Int'l Ladies' Garment Workers' Union, AFL-CIO v. NLRB, 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961).

Respondent challenges the Board's order for reinstatement of the strikers on the grounds that the complaint before the Board did not contain an allegation of respondent's unlawful discrimination against the strikers and that this issue was not litigated. The company points out that it was assured by the examiner during the hearing that the issue of discrimination was not being tried. Respondent is correct in saying that the issue of discriminatory refusal to rehire the strikers was neither alleged nor litigated in the proceeding before the Board.

The Board has admitted that this issue is the subject of another charge presently pending in a separate proceeding. The General Counsel urges, however, that there need not be an allegation and a finding of discriminatory refusal to rehire before issuance of an order for reinstatement. We are in agreement with this position. Section 10(c) of the act specifically provides that upon a finding of an unfair labor practice, the Board may "take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this Act." This language enables the Board to order reinstatement after it has found the existence of an unfair labor practice which has properly been charged and litigated. The mere fact that the Board did not specify the

issue of reinstatement in its complaint does not bar reinstatement as a remedy since the act explicitly provides for such remedy when unfair labor practices have been proved. Republic Steel Corp. v. NLRB, 107 F.2d 472 (3rd Cir. 1939), modified on other grounds, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6 (1940).

In the case at bar the Board found respondent guilty of violating sections 8(a) (1), 8(a) (2), and 8(a) (5) of the act and then ordered reinstatement of those strikers who had become unfair labor practice strikers by reason of the company's section 8(a) (5) refusal to bargain. Respondent is, in effect, implying that there always must be a finding of a section 8(a) (3) violation before reinstatement is ordered. We do not agree. In another case this court has noted that a finding of a section 8(a) (5) violation may properly be followed by a reinstatement order. There we said: "[P]etitioner was charged and has been found guilty of a refusal to bargain collectively with the Union which has caused its employees to continue to strike. The remedy provided for such violation is reinstatement and reimbursement for those affected by such unfair labor practice." Stewart Die Casting Corp. v. NLRB, 114 F.2d 849, 856 (7th Cir. 1940), cert. denied, 312 U.S. 680, 61 S.Ct. 449, 85 L.Ed. 1119 (1940).

The trial examiner in the present proceeding did not include reinstatement in his recommended order. It appears that this failure on his part was simply an oversight since, having noted in his intermediate report that the strikers had made an unconditional application for reinstatement, he said that he would recommend that there be such reinstatement with back pay. The Board's order merely modified the examiner's recommended order in this respect so that it included the usual reinstatement provision.

The Board's order will be enforced.